UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DOMINIQUE MACLIN-
SHELTON,

                    Plaintiff,

v.

ANGEL'S PLACE,

                    Defendant.

Case No. 24-10092
Honorable Shalina D. Kumar
Magistrate Judge Anthony P. Patti

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 21)**

---

## I.   INTRODUCTION

Plaintiff Dominique Maclin-Shelton ("Maclin-Shelton") sues defendant

Angel's Place ("Angel's Place"), her former employer, alleging unlawful

workplace discrimination, harassment, and retaliation. ECF No. 1. On

January 11, 2024, Maclin-Shelton filed an eight-count complaint alleging:

Count I- Retaliation (42 U.S.C. § 1981)

Count II- Racial Discrimination (42 U.S.C. § 1981)

Count III- Retaliation (Title VII of the Civil Rights Act of 1964 ("Title
VII"), 42 U.S.C. § 2000e-3(a))

Count IV- Retaliation (Michigan's Elliot-Larsen Civil Rights Act
("ELCRA"), M.C.L. 37.2101 *et seq.*)

1

Count V- Racial Discrimination (Title VII)

Count VI- Racial Harassment & Discrimination (ELCRA)

Count VII- Age Discrimination (29 U.S.C. § 621, *et seq.* ("ADEA")

Count VIII- Age Harassment & Discrimination (ELCRA)

*Id.* The Court summarizes the myriad counts as follows: (1) retaliation (§ 1981, Title VII, ELCRA); (2) racial discrimination (§1981, Title VII, ELCRA); (3) age discrimination (ADEA, ELCRA); and (4) race and age harassment (ELCRA).

Angel's Place filed a motion for summary judgment, which is fully briefed. ECF Nos. 21, 22, 24. The Court has determined that oral argument is unnecessary. *See* E.D. Mich. L.R. 7.1(f)(2). For the reasons set forth below, the Court grants in part and denies in part Angel's Place's motion.

## II.   FACTUAL BACKGROUND

Angel's Place is a non-profit organization that provides residential housing, care, and support for people with developmental disabilities. ECF No. 21-2, PageID.118. Its residential homes provide 24-hour licensed adult foster care and unlicensed semi-independent settings, with each home staffed to ensure the residents' well-being and safety. *Id.* at PageID.118. The homes are overseen by the Program Director, managed by a Home Manager who ensures the administration and care of the home, and staffed

2

by around-the-clock Direct Care Professionals who provide the residents' care. *Id.* Angel's Place residents also have a guardian, who monitors and ensures the residents are receiving proper care from the staff. *Id.*

Maclin-Shelton began her employment at Angel's Place on November 30, 2021. She worked the 2PM to 10PM shift as a Direct Care Worker/Coordinator of Resident Nutrition at the St. Francis Family Home. *Id.* Her duties included cleaning the home, preparing meals, providing personal hygiene assistance to the residents, and administering medications. ECF No. 21-3, PageID.135. During her employment, Shelly Phenix ("Phenix") was Maclin-Shelton's district supervisor. Phenix was involved with hiring, training, and termination of direct care workers, administering corrective actions, and overseeing the operations of the residential care homes. Initially, Tierra Clark served as Maclin-Shelton's Home Manager; Ashley Gist ("Gist") took over as Maclin-Shelton's Home Manager beginning in June 2022. Maclin-Shelton also worked alongside other direct care workers, including Renee Calvin ("Calvin"), Michael Argunwa ("Argunwa"), and Mike Harabedian ("Harabedian") during her shifts at the St. Francis Home. *Id.* at PageID.136. Most people working at the home were African American and older than plaintiff, who was approximately 46 years old when she was employed at Angel's Place. *Id.* at PageID.125, 136-37.

3

Maclin-Shelton was put on a 60-day work improvement plan about two months after her employment began for issues regarding residential personal care and hygiene, interactions not meeting the rules of conduct, and communication issues with other staff. ECF No. 21-4. Although she successfully completed the work improvement plan, other performance issues arose.

For example, on February 19, 2022, she received a written warning for failing to administer a resident's medication on time and was required to complete a medication demonstration class as corrective action. ECF No. 21-5. Then on April 29, 2022, Maclin-Shelton received another written corrective action for failing to unplug electronics in the home and falsifying the chore chart stating those duties were performed. ECF No. 21-6. A written warning was issued on May 19, 2022 because Maclin-Shelton left the home in a poor and unsafe condition by leaving the garage doors open, multiple appliances running, and several lights on. ECF No. 21-7. Maclin-Shelton received another corrective action on June 17, 2022, for failing to complete a resident's nighttime routine and diet book form and allowing a therapist to be in the home without a mask or completing the required visitor log. ECF No. 21-8. The performance issues persisted into July, when Maclin-Shelton met with Phenix and HR regarding concerns that she was speaking negatively

4

about coworkers to others, ignoring coworkers when they were attempting to communicate about residential care, and not engaging in resident care and activities. ECF No. 21-9. There was also the issue of her tardiness and not reporting to work on July 30, 2022, for which Phenix and Gist planned on implementing a second work improvement plan. *Id.* at PageID.176.

Maclin-Shelton also had a difficult relationship with Gist, Maclin-Shelton's Home Manager from June 2022. In the short time they worked together, Maclin-Shelton complained to Phenix on three or four occasions that Gist was rude, mean, and power-hungry. Most notably, Maclin-Shelton complained about two weeks before her August 10, 2022, termination that Gist purportedly told her that her co-worker, Renee Calvin, "was too old to be working there." ECF No. 21-3, PageID.139.

Maclin-Shelton's performance-related issues came to a head on August 8, 2022. Maclin-Shelton was working with other direct care workers, Calvin and Harabedian, when Harabedian supposedly left a pantry door open, allowing a resident subject to monitored eating protocols to access the pantry and eat food in violation of his standard of care. ECF No. 21-10, PageID.179. Although Maclin-Shelton claims she closed the pantry door at some point, it was only after the resident obtained access to the food. ECF No. 21-11; 21-3, PageID.141. Maclin-Shelton was also involved with a

5

medication misstep that same day. Calvin was administering medication to a resident, with Maclin-Shelton acting as the medication "checker" pursuant to the buddy system, when the pill fell out of the resident's mouth onto the floor. ECF No. 21-3, PageID.140. Calvin and Maclin-Shelton called Gist to ensure contamination protocol was followed, and Maclin-Shelton signed off on the medication pass. *Id.* However, the medication was supposedly administered before the resident's prescribed time. ECF No. 21-10, PageID.179.

Maclin-Shelton's employment was terminated two days later on August 10, 2022, with the termination letter citing the August 8th pantry and medication pass issues as the reasons. ECF No. 21-10, PageID.175. Phenix and Janice Klein, Angel Place's HR Director, were present during the termination meeting. ECF No. 21-3, PageID.150; ECF No. 23-2, PageID.274. The Office of Recipient Rights ("ORR") also investigated the pantry incident following a call from the resident's guardian. ECF No. 23-2, PageID.274. The ORR reviewed the video footage capturing the incident and substantiated the allegation and found Maclin-Shelton, Calvin, and Harabedian committed Neglect Class III and recommended "firm but fair disciplinary action" against the three. ECF No. 21-11, PageID.191. Calvin's employment was terminated around the same time as Maclin-Shelton's and the parties dispute whether Harabedian voluntarily left Angel's Place in the

6

months following the incident or if he was dismissed as a result of the pantry incident.

Maclin-Shelton filed a charge of discrimination with the EEOC and received her Right to Sue Letter on October 16, 2023. ECF No. 1, PageID.6, ¶ 32. She then filed the present lawsuit on January 11, 2024, alleging that she was subjected to race and age discrimination and harassment during her employment with Angel's Place, as demonstrated by her termination, and that Angel's Place retaliated against her by terminating her in response to her complaints of unlawful discrimination and harassment. Angel's Place seeks dismissal of Maclin-Shelton's complaint in its entirety. ECF No. 21.

## III.   STANDARD OF REVIEW

If a party moves for summary judgment, it will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The Court may not grant summary judgment if "the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "must view all evidence and draw all inferences in the light most favorable to the nonmoving party." *Codrington v. Dolak*, 142 F.4th 884, 890 (6th Cir. 2025) (citing *Anderson*, 477 U.S. at 255).

Where the movant establishes a lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). However, it is "the actual proof," and not "isolated, conclusory allegations," that the Court must view "in the light most favorable to the nonmovant." *Baker v. Blackhawk Mining, LLC*, 141 F.4th 760, 766 (6th Cir. 2025) (citing *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 519 (6th Cir. 2008)). The "party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). The Court "is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).

8

Moreover, "[t]he non-moving party must 'do more than simply show that there is some metaphysical doubt as to the material facts.'" *Baker v. City of Trenton*, 936 F.3d 523, 529 (6th Cir. 2019) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Rather, "[t]o survive summary judgment, the nonmoving party 'must present significant probative evidence' putting the material facts in doubt." *Walden v. GE Int'l, Inc.*, 119 F.4th 1049, 1057 (6th Cir. 2024) (quoting *Green Genie, Inc. v. City of Detroit*, 63 F.4th 521, 526 (6th Cir. 2023)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252. "The question is whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 843 (6th Cir. 2015) (quoting *Anderson*, 477 U.S. at 251–52).

## IV.   ANALYSIS

### a. Racial Discrimination Claims

Counts II, V, and VI allege racial discrimination in violation of 42 U.S.C. § 1981, Title VII, and ELCRA respectively. Maclin-Shelton claims that Angel's Place subjected its African American employees to race-based disparate treatment, and specifically points to her employment, and the employment of

an African American man, Calvin, being terminated after the pantry incident, but the white employee, Harabedian, who was also culpable, was not terminated and left Angel's Place voluntarily a few months later. ECF No. 22, PageID.223.

Discrimination claims under 42 U.S.C § 1981, Title VII, and ELCRA are reviewed under the same standard. *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771 (6th Cir. 2018); *see also Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) ("We review claims of alleged race discrimination brought under § 1981 and the Elliot-Larsen Act under the same standards as claims of race discrimination brought under Title VII of the Civil Rights Act of 1964."). Discrimination claims based on circumstantial evidence are subject to the *McDonnell Douglas* burden-shifting framework. *Id.* Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *Id.* Then, the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for the discharge. *Id.* If the employer meets its burden, the plaintiff must then prove by a preponderance of the evidence that the proffered reasons were pretextual. *Id.*

To establish a *prima facie* case of racial discrimination, a plaintiff must show that:

(1) she was a member of a protected class;

(2) she suffered an adverse employment action;

(3) she was qualified for the position; and

(4) she was treated differently than a similarly-situated, non-protected employee.

*Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (citing

*DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004)).[1]

Angel's Place moves for summary judgment in its favor on Maclin-Shelton's racial discrimination claims, arguing that Maclin-Shelton cannot support those claims because there is no evidence that she was treated unfairly because of her race, or that the decision to terminate her employment was motivated by racial animus.[2] Angel's Place points to Maclin-Shelton's testimony, where she states that she did not complain of racial discrimination, that no comments were made about her race, that she does not believe she was terminated because of her race, and that Gist was just mean and a bully to everyone. ECF No 21-3, PageID.142, 152. Angel's Place also claims racial animus is lacking because Gist is African American,

---

[1] As an initial matter, Angel's Place failed to assess the prima facie elements of a racial discrimination claim and combined its analysis under the elements of a hostile work environment claim. ECF No 21, PageID.107.

[2] "Indirect or circumstantial evidence of discrimination . . . permits the inference that the employer acted with discriminatory animus." *Harris v. Giant Eagle Inc.*, 133 F. App'x 288, 293 (6th Cir. 2005) (citing *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir.1997)).

along with most of her subordinates. ECF No. 21-3, PageID.137. Maclin-Shelton ignores her testimony, and instead counters that there is sufficient evidence to infer race-based disparate treatment. Specifically, Maclin-Shelton asserts that despite the fact that she was being terminated for not closing the pantry door, Harabedian, the white male employee who initially opened the door, remained employed and left his job voluntarily a few months after the incident occurred. ECF No. 22, PageID.223.

Indeed, the fourth prong of the prima facie case requires plaintiff to show that she was treated differently than similarly situated employees from outside the protected class. The Sixth Circuit has identified three factors to gauge similarity between the plaintiff and comparator. They (1) must share the same supervisor; (2) be subject to the same standards; and (3) have engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). But the Sixth Circuit is also clear that these factors are not rigid and that the Court is to "make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Id.* The circumstances of the two employees need not be identical, but they must be

12

similar in "all of the *relevant* aspects." *Id.* The underlying conduct need not be identical, but more severe sanctions imposed for more egregious conduct will defeat an inference of discrimination. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 777 (6th Cir. 2016). A plaintiff alleging discriminatory treatment in the form of employee discipline bears the burden of establishing that a comparator employee's actions were of "comparable seriousness to his or her own infraction." *Mitchell,* 964 F.2d at 583 n.5.

As previously stated, Maclin-Shelton identifies Harabedian as a comparator, a white employee, who engaged in similar conduct as her without the same consequences. Although the parties dispute whether Harabedian was terminated for the pantry incident or voluntarily left defendant's employ,[3] or if Maclin-Shelton was aware of the pantry door being left open by Harabedian, the Court nonetheless finds that Maclin-Shelton failed to establish that they were similarly situated.

Here, the ORR report states that the video footage from August 8, 2022 shows Harabedian opening the pantry door, leaving it opened, and Maclin-Shelton and Calvin entering the kitchen area on several occasions

---

[3] *Compare* ECF No. 21-11, PageID.191 (ORR received confirmation on October 18, 2022, that Harabedian "separated" from the company) *with* ECF No. 23-2, PageID.276 (Phenix testifying that Harabedian was terminated because of the pantry incident).

with the pantry door still open, and that the pantry remained unlocked for

approximately 39 minutes until Maclin-Shelton closed it. ECF No. 21-11,

PageID.187-88; ECF No. 21-3, PageID.141; ECF No. 23-1, PageID.258. The

ORR report also states that:

> [Maclin-Shelton] reported that [Harabedian] went into the pantry to
> get the books while [Calvin] began passing medications . . .
> [Maclin-Shelton] acknowledged that she did see [Harabedian]
> open the pantry door and that the door was still open when she
> left the area, although she noted that [Calvin] and [Harabedian]
> were still in the kitchen area at this time . . . .

ECF No. 21-11, PageID.186. Shannon White-Shellenberger, Angel Place's

current Chief Operating Officer and former Chief Program Officer, also

testified that the pantry incident was captured on video and that the three

staff members were all in observance of the door being left open multiple

times throughout the situation. ECF No. 23-1, PageID.258. However, Maclin-

Shelton denies being aware that the pantry door was open prior to her

closing it as described in the ORR report, claiming that it is "impossible" that

it was her because she was not in the kitchen. ECF No. 23-2, PageID.285.[4]

---

[4] Maclin-Shelton's deposition testimony regarding the pantry door incident is
far from clear and lacks sufficient detail which would permit the Court to
assess her awareness of the door remaining open and her presence in the
kitchen. This lack of clarity, in addition to the video's absence from the record
in consideration for Angel Place's motion for summary judgment, could
render Maclin-Shelton's awareness of the door remaining open a genuine
factual dispute.

Nevertheless, it is undisputed that the resident was able to enter and eat food from the pantry in violation of his treatment plan because of the pantry being opened and unattended. ECF No. 21-11, PageID.188. Maclin-Shelton testified that the resident already got into the food by the time she closed the door and reported the same to Phenix when asked about the incident. ECF No. 21-3, PageID.141; ECF No. 23-2, PageID.275. She further stated that it would have been any worker's responsibility to close the door if they saw it opened, and the door was always supposed to be closed for the resident's safety and pursuant to their plan. ECF No. 21-3, PageID.141.

Indeed, the ORR reflects that all shift staff were equally responsible for ensuring the pantry door was closed and/or the resident was monitored while it was open:

> It is noted that there is no specification and/or procedure in place in which one specific staff is expected to be responsible for ensuring that the pantry door is closed and/or that [the resident] is monitored by staff while eating. Rather, this is a shared responsibility of all staff on shift. Given that all staff on shift at this time were aware of the pantry door being open, and were also aware of [the resident's] needs, there is no indication that one staff was more or less responsible than others to ensure adherence to these directives. As such, the substantiation is therefore applicable to all staff on shift.

ECF No. 21-11, PageID.189.

But factual issues regarding Harabedian's termination and Maclin-Shelton's awareness of the pantry door remaining open are not material to the Court's determination that Maclin-Shelton has not met her burden of showing that Harabedian was similarly situated to her "in all relevant aspects" for the reasons discussed in more detail below. *Ercegovich,* 154 F.3d at 352.  First, the Court notes that Maclin-Shelton committed a medication infraction that same day. See ECF No. 21-10.[5] Maclin-Shelton testified that Calvin was passing medication to a resident, and that she was performing her role as the "checker" under the buddy system. ECF No. 21-3, PageID.140. When the medication fell out of the resident's mouth onto the floor, Calvin called Gist to establish protocol for the contaminated pill, and Maclin-Shelton signed off on the medication pass. *Id.* Maclin-Shelton's termination form states she witnessed and documented Calvin administer the resident's medication prior to the time established by the resident's treatment plan and the resident did not receive the medication according to prescription times as a result. ECF No. 21-10, PageID.179. Two days later, Maclin-Shelton was informed that she was being terminated for the

---

[5] Notably, Maclin-Shelton also failed to administer medication in a timely manner on another occasion. ECF No. 21-3, PageID.138; ECF No. 21-5.

medication pass incident. ECF No. 21-3, PageID.140.[6] Moreover, Phenix testified that Maclin-Shelton's employment was terminated because of *both* incidents:

> A: The termination was in regards to the pantry, and then I believe there was a medication discrepancy as well on that date. So it was two things on that day.

ECF No. 21-11, PageID.188. Moreover, White-Shellenberger testified to the severity of medication errors in relation to disciplinary actions, stating that corrective actions "depend[] on the severity of what you're doing. So a medication error is very, very different than, you know maybe not cleaning the toilet correctly . . . [B]ut when you're making medication error or health and safety issues, then that is something that elevates much more quickly[.]" ECF No. 23-1, PageID.267. White-Shellenberger also clarified that under the medication pass buddy system, if one worker made the actual error but the other worker did not check them, the checker would receive disciplinary action for the error too. *Id.*

Here, there is no evidence that Harabedian engaged in other additional misconduct aside from the pantry incident that day. Additionally, Maclin-

---

[6] Although Maclin-Shelton takes issue with the fact that she and Calvin followed Gist's instructions regarding the contamination protocol after the medication fell onto the floor, she does not address whether that medication was administered prior to the resident's prescription time in the first place— which is listed as the reason for her termination. ECF No. 21-10.

Shelton does not argue that her failure to ensure timely medication administration is not grounds for termination. Indeed, a resident's failure to receive medication according to their prescribed schedule presents a serious health and safety risk, and it is therefore reasonable for Angel's Place to impose severe disciplinary measures for this misconduct—especially given Maclin-Shelton's prior write-up for the same error, for which she received additional training.

As the Sixth Circuit held in *Mitchell,* the employees to whom the plaintiff seeks to compare herself must "have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." 964 F.2d at 583. As further explained in *Ercegovich,* the plaintiff is required to "demonstrate that he or she is similarly-situated to the non-protected employee in all *relevant* respects." 154 F.3d at 353 (emphasis in original). So even if Maclin-Shelton and Harabedian engaged in similar conduct as it relates to the pantry incident, the Court finds that the mismanagement of a medication pass on the same day is an additional, severe infraction distinguishing her from her comparator.

Moreover, Maclin-Shelton had additional offenses that occurred before the August 8, 2022 incidents which further distinguish her from Harabedian.

18

Where an employer uses a system of progressive discipline, the disciplinary history of a plaintiff is critical to evaluating disparate treatment. *Berry v. City of Pontiac*, 269 F. App'x 545, 549 (6th Cir. 2008) (plaintiff could not show that two proposed comparators were similarly situated when their progressive disciplinary history was not as extensive as plaintiff's history). Maclin-Shelton's work record has a litany of performance concerns regarding residential personal care and hygiene, communication, failing to follow chore charts and unplugging electronics, leaving a home without closing garage doors and failing to leave the home in a good and safe condition, failing to follow clothing, evening, and dietary routines, speaking negatively about co-workers, and not appearing for work. ECF Nos. 21-6–21-9. She was also put on a work improvement plan in January 2022—about two months after she became employed with Angel's Place. ECF No. 214.

Maclin-Shelton provides no evidence showing that Harabedian had a similar or worse employment record and testified that she has not seen his personnel file and does not know if he got a write-up for the pantry incident. ECF No. 21-3, PageID.139. Without such evidence, Maclin-Shelton cannot establish that they were similarly situated.

That Maclin-Shelton has not established Harabedian as a comparator is consistent with the Sixth Circuit's holding in *Quinn-Hunt v. Bennett*

19

*Enterprises, Inc.*, 211 F. App'x 452 (6th Cir. 2006). In *Quinn-Hunt*, the plaintiff had been disciplined several times for excessive tardiness and for falling asleep at work. *Id.* at 454. Her employer ultimately fired her after another incident of excessive tardiness. *Id.* She argued that two other employees—who had also reportedly been late—were similarly situated. *Id.* at 458. The Sixth Circuit rejected her argument, concluding that those employees were not similarly situated because they had never been "excessively tardy" and had not engaged in additional misconduct, such as sleeping on the job. *Id.* Likewise, the severity and frequency of Maclin-Shelton's infractions distinguish her from Harabedian. Notably, the record is devoid of *any* evidence of Harabedian's disciplinary record, let alone a substantial one like Maclin-Shelton's. Accordingly, Maclin-Shelton fails to establish that Angel's Place treated a similarly situated employee more favorably than her.

Therefore, Maclin-Shelton has not established a prima-facie case for racial discrimination. Summary judgment in favor of Angel's Place is warranted for the racial discrimination claims.

### b. Age Discrimination Claims

Counts VII and VIII allege age discrimination in violation of the ADEA and ELCRA. Maclin-Shelton, who was approximately 46 during her employment, claims that Angel's Place subjected her to age-based

20

disparate treatment. ECF No. 22, PageID.225.

The ADEA and ELCRA prohibit an employer from discriminating against employees based on age. 29 U.S.C. § 623(a)(1); M.C.L. § 37.2202(1)(a). Under both the ADEA and ELCRA, a plaintiff must show that but for her age, her employer would not have taken the adverse action. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 178 (2009) (ADEA); *Drews v. Berrien Cty.*, 839 F. App'x 1010, 1012 (6th Cir. 2021) (*citing Hecht v. National Heritage Academies, Inc.*, 886 N.W.2d 135, 146 (Mich. 2016)) (ELCRA); *see also Rouch World, LLC v. Dep't of Civil Rights*, 987 N.W.2d 501, 512 (Mich. 2022) (adopting the but-for causation standard applied to federal discrimination claims for ELCRA discrimination claims).[7] Plaintiffs may establish ADEA or ELCRA violations through either direct or circumstantial evidence. *Tilley v. Kalamazoo Cty. Road Comm'n*, 777 F.3d 303, 307 (6th Cir. 2015) (*citing Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009)). As with other discrimination claims, courts apply the familiar *McDonnell Douglas* burden-shifting framework to age discrimination claims such as this one. *Geiger*, 579 F.3d at 622.

To establish a prima facie case of age discrimination, Maclin-Shelton

---

[7] Courts analyze age discrimination claims under the same framework for both the federal and state statutes. *Drews*, 839 F. App'x at 1012.

must show that: (1) she was a member of a protected class (older than 40 years old); (2) she suffered an adverse employment action; (3) she was qualified for the position held; and (4) she was replaced by someone outside of the protected class or similarly situated non-protected employees were treated more favorably. *Geiger*, 579 F.3d at 622–23. In ELCRA age discrimination cases, a plaintiff may also satisfy the fourth element of her prima facie case "with evidence that the defendant treated the plaintiff differently than persons of a different age class who engaged in the same or similar conduct." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 818 (6th Cir. 2011) (*citing Town v. Michigan Bell Telephone, Co.*, 455 Mich. 688, 568 (1997)). This light burden is "'easily met' and 'not onerous.'" *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 808 (6th Cir. 2020) (*quoting Provenzano*, 663 F.3d at 813).

Angel's Place does not dispute that Maclin-Shelton satisfied the first three elements of her prima facie case. Rather, Angel's Place asserts that she cannot meet the fourth element of her age discrimination claim—that is, whether she was replaced by, or treated less favorably than, someone outside the protected class. First, Maclin-Shelton has not provided evidence that she was replaced by a younger worker. "When an employee claims that she was replaced but cannot 'identify any specific employee[ ] who

replaced' her, she cannot establish a prima-facie case of discrimination."

*Warren v. Hollingsworth Mgt. Services, LLC*, 2022 WL 18542504, at *3 (6th

Cir. Dec. 19, 2022) (*quoting Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d

900, 907 (6th Cir. 2002)). Nor has Maclin-Shelton identified any younger

employee who engaged in similar misconduct yet remained employed by

Angel's Place. Indeed, Maclin-Shelton testified that the majority of her

coworkers were over forty, including Mike Harabedian who was older than

her at 62. ECF No. 21-3, PageID.137.

And to the extent that Maclin-Shelton identifies her "younger"

supervisor, Gist, as an employee who was treated more favorably than

herself, that argument also fails. As noted above, in a similarly situated

analysis, a plaintiff must identify at least one comparable employee outside

the protected class who was similarly situated in all relevant respects, but

who nonetheless received more favorable treatment. Maclin-Shelton

provided the Court with no evidence to meet her burden of showing that Gist

engaged in similar conduct or had a disciplinary record as substantial as

herself. The conduct Gist allegedly engaged in and did not receive

punishment for—making the ageist remark that Calvin was "too old to be

working there"—is not the same as, or similar to, Maclin-Shelton's conduct at

issue here—violating a resident's standard of care in regard to the pantry

access and medication pass incidents. As inappropriate and offensive as Gist's purported comment may be, a reasonable juror could not find that an isolated offensive remark, was similar to, or more severe than, conduct that jeopardized the health and safety of a resident.

Additionally, Maclin-Shelton failed to introduce any evidence to support her argument that Gist was disciplined less severely or not disciplined at all for this remark. Moreover, her argument that she was treated less favorably than her supervisor is inapposite because Maclin-Shelton is not similarly situated to supervisory employees. The Court notes that several district courts within the Sixth Circuit have found that supervisory and non-supervisory employees should not be compared for purposes of a similarly-situated inquiry. *Davis v. Ineos ABS (USA) Corp.*, 2011 WL 1114409, at *4 (S.D. Ohio. Mar. 24, 2011) (distinguishing between a non-supervisory plaintiff and supervisory comparators); *Quinn–Hunt v. Bennett Enterprises, Inc.*, 2005 WL 2174053, at *3 (N.D. Ohio. Sept. 7, 2005) ("Supervisory and non-supervisory employees are not similarly situated, and an employer may therefore justifiably treat such employees differently."); *Mugno v. Wal–Mart Stores, Inc.*, 2009 WL 737107, at *4 (E.D. Tenn. Mar. 20, 2009) (finding that the plaintiff, a supervisory employee, was not similarly situated to a non-supervisory employee to whom she compared herself).

24

Notwithstanding her failure to show that she was replaced by, or treated less favorably than, someone outside her protected class, it appears that Maclin-Shelton argues that she can satisfy the fourth element of a prima facie case of age discrimination based on Gist's allegedly ageist comment about Calvin. The Sixth Circuit has noted that circumstances where the employer replaced a plaintiff with a younger employee or treated a similarly situated, non-protected employee more favorably are but two "context-dependent ways by which plaintiffs may establish a prima facie case, and [are] not rigid requirements that all plaintiffs with similar claims must meet regardless of context." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 529 (6th Cir. 2007), *overruled on other grounds by Gross*, 557 U.S. 167 (2009); *see also Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 808 (6th Cir. 2020) (reciting fourth element of prima facie case of indirect age discrimination as "circumstances that support an inference of discrimination"). "The key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence to permit a reasonable jury to conclude that [the plaintiff was terminated] under circumstances giving rise to an inference of unlawful discrimination." *Blair,* 505 F.3d at 529.

But Maclin-Shelton's testimony cuts against a finding that her

termination or any unfair treatment was due to impermissible reasons. She acknowledged that she never complained of being treated unfairly because of her age, that Gist's alleged bullying was directed at everyone generally, that no one ever made comments about her age, and that she believed she was terminated for reporting Gist's mean, malicious, and power-hungry behavior—not because of her age or race. ECF No 21-3, PageID.142, 152. Nor has she pointed to evidence demonstrating that Gist had authority over or participated in the decision to terminate her, or that any decision-maker made ageist remarks for that matter. *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir.2000) (statements by non-decision makers insufficient to show discriminatory animus); *see also Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir.1998) (same). Even viewing the record in a light most favorable to Maclin-Shelton, the Court finds that the singular statement Gist made about another employee's age is insufficient circumstantial evidence to create a genuine issue of material fact that she was terminated because of her age. Accordingly, Angel's Place is entitled to summary judgment on Maclin-Shelton's age discrimination claims under the ADEA and ELCRA.

### c. Hostile Work Environment Claims

Next, Maclin-Shelton brings claims of hostile work environment under

26

ECLRA, alleging she was harassed due to her race and age. *See* Counts VII and VIII.[8] In order to establish a hostile work environment claim under ELCRA, a plaintiff must demonstrate that: (1) [she] belongs to a protected class; (2) [she] was subject to unwelcome harassment; (3) the harassment was based on [a protected category]; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant knew or should have known about the harassment and failed to take action. *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 472 (6th Cir. 2020) (cleaned up) (quoting *Phillips v. UAW Int'l*, 854 F.3d 323, 327 (6th Cir. 2017)). "When evaluating these claims ... [courts] look[ ] at the totality of the alleged harassment to determine whether it was sufficiently severe or pervasive to alter the conditions of a plaintiff's employment and create an abusive working environment." *Id.* (cleaned up). The Sixth Circuit "has established a relatively high bar for what

_____

[8] Maclin-Shelton arguably brings a hostile work environment claim under Title VII—although not explicitly asserted as a Count in her Complaint. Rather, it is couched within her Title VII racial discrimination claim. See ECF No. 1, PageID.14, ¶ 83 ("The unwelcomed conduct and communication was intended to and in fact did substantially interfere with Plaintiff's employment and created an intimidating, hostile, and/or offensive work environment as alleged in the statement of facts."). The Court will address Maclin-Shelton's Title VII hostile work environment claim with her ELCRA claims. *Phillips v. UAW Int'l*, 854 F.3d 323, 327 & n.3 (6th Cir. 2017) (noting elements are "substantially the same" under Title VII or ELCRA*); Quinto v. Cross & Peters Co.*, 451 Mich. 358, 369 (1996).

amounts to actionable discriminatory conduct under a hostile work environment theory." *Id.* (quoting *Phillips*, 854 F.3d at 328). "For example, in the context of alleged racial discrimination, [the Sixth Circuit] has determined that 'even offensive and bigoted conduct is insufficient to constitute a hostile work environment if it is neither pervasive nor severe enough to satisfy the claim's requirements.'" *Id.* (quoting *Phillips*, 854 F.3d at 328). Significantly, isolated incidents or occasional offensive utterances are not actionable because they are generally not severe or pervasive enough to create a hostile environment. *Phillips*, 854 F.3d at 327.

Maclin-Shelton has failed to meet this "high bar" with respect to her hostile work environment claims. As previously stated, Maclin-Shelton acknowledged that she never complained of being treated unfairly because of her age or race, that Gist's alleged bullying was directed at everyone generally, that nobody ever made comments about her age or race, and that she believed Gist's treatment of her was because she was a mean, malicious, and power-hungry person and they had disagreements. ECF No. 21-3, PageID.142, 152.

Even if these concessions were not fatal to Maclin-Shelton's hostile work environment claim, Maclin-Shelton does not identify any evidence of hostility severe or pervasive enough to establish a hostile work environment.

28

Indeed, Maclin-Shelton claims that she heard Gist make only a single comment that Calvin was "too old to be working there." Although offensive, Gist's isolated remark about Calvin's age cannot amount to severe and pervasive conduct that created an abusive working environment. *See Phillips*, 854 F.3d at 327. Accordingly, Maclin-Shelton's hostile work environment/harassment claims do not survive summary judgment.

### d. Retaliation Claims

Lastly, Counts I, III, and IV allege retaliation in violation of 42 U.S.C § 1981, Title VII, and ELCRA respectively. Title VII forbids an employer from retaliating or discriminating against an employee because the employee opposed an unlawful employment practice under Title VII. 42 U.S.C. § 2000e-3(a). ELCRA's analogous provision prohibits retaliation or discrimination against an employee who opposed a violation of the statute. MCL § 37.2701. Finally, 42 U.S.C. § 1981 overlaps with Title VII and prohibits an employer from retaliating against an employee for opposing racial discrimination. *CBOCS West, Inc. v. Humphries,* 553 U.S. 442, 454–55 (2008). Retaliation claims under 42 U.S.C § 1981, Title VII, and ELCRA are all analyzed under the same standard. *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018). Again, the *McDonnell Douglas* burden-shifting framework applies to analyze circumstantial evidence of retaliation.

29

*Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (2014). To establish a *prima facie* retaliation claim, a plaintiff must establish that: (1) she engaged in a protected activity; (2) her exercise of such protected activity was known by the defendant; (3) she suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Rogers*, 897 F.3d at 775.

Angel's Place only disputes the first element, arguing that Maclin-Shelton cannot establish her prima facie claim of retaliation because she did not engage in protected activity. Specifically, Angel's Place claims her generalized and vague complaints of bullying do not constitute protected activity because she did not indicate the treatment was based on a protected status such as race or age like she claims. ECF No. 21, PageID.111-13. Defendant supports its position with Maclin-Shelton's deposition testimony, where she admits that she did not lodge complaints regarding race or age discrimination or harassment:

> **Q:** Number nine asked "Admit that you did not make a complaint of discrimination and/or harassment on the basis of race." And you said that you complained about Ashley being a bully. Can we agree that your complaint wasn't about race, it was about Ashley?
> **A:** Yes, it wasn't about race.
> **Q:** Okay. The same thing in number ten about age. You didn't complaint about age?
> **A:** I didn't complain about age, but I overheard her talking about the other staff that worked there saying they were too old to be

30

working there.
**Q:** About Renee?
**A:** Yes.
**Q:** But you didn't complain that you were treated bad based on age, correct?
**A:** No.
**Q:** Ashley was bulling you because she is a bully, correct?
**A:** Yes.

ECF No. 21-3, PageID.152.

Moreover, when recounting an argument she and Gist had in front of

Phenix, Maclin-Shelton testified that she only voiced her opinion that Gist

was a bully—not a racist bully:

> **Q:** Do you remember anything that Ashley said?
> **A:** She said that she don't act that way. I told her you do act that way. I told her you do act that way. We kind of got into a little argument in front of Shelly. Because I told her, I said, you do act that way, and I told her she was a bully. I said can't nobody say anything to you guys, because if you say anything you disagree with, you guys write us up or threaten our jobs.
> **Q:** And Ashley is African-American, right?
> **A:** Yes, she is.
> **Q:** You weren't saying that she was a racist bully, just a power hungry bully?
> **A:** No, just a bully, a power hungry person.

ECF No. 21-3, PageID.146.

Indeed, making a complaint about matters not protected by the

applicable statutes is not engaging in "protected activity."  "Protected

activity," for purposes of a retaliation claim, can include an internal

"complaint to management about discriminatory employment practices" so

31

long as it goes "beyond a vague charge of discrimination." *Kovacs v. Univ. of Tol.*, 711 F. Supp. 3d 697, 706 (N.D. Ohio 2024) (citing *Jackson*, 999 F.3d at 344–45) (citation modified). "However, the employee must do more than generally assert unfair treatment." *Barrett v. Kirkland Cmt. Coll.*, 245 Mich. App. 306, 319–20 (2001). Instead, the "charge must clearly convey to an objective employer that the employee is raising the specter of a claim of unlawful discrimination pursuant to [ELCRA]." *Id.*

Here, Maclin-Shelton's testimony is fatal to her race-based retaliation claims as she never complained to management that she or others were treated differently because they are African American. Rather, the evidence only establishes that Maclin-Shelton complained about generalized, unfair treatment from Gist, who was a bully—but not a racist bully according to her own testimony. Because Maclin-Shelton's complaints contained no "specter of a claim of unlawful [race] discrimination," *id.*, her complaints cannot be considered "protected activity" required for her to succeed on the race-based retaliation claims asserted under Title VII, § 1981, and ELCRA.

That leaves Maclin-Shelton's age-based ELCRA retaliation claim. Reporting age-based discrimination is a protected activity under ELCRA.[9]

_____

[9] Maclin-Shelton does not assert an age-based retaliation claim under the ADEA. *See* ECF No. 1.

Maclin-Shelton engaged in protected activity by reporting Gist's "too old to work" comment. Because this element is the only one challenged by Angel's Place, Maclin-Shelton's ELCRA retaliation claim withstands the motion for summary judgment.

However, with the dismissal of Maclin-Shelton's federal claims, the Court declines to exercise supplemental jurisdiction over the sole remaining state-law claim by dismissing it without prejudice. 28 U.S.C. § 1367(c); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1976) ("[I]f the federal claims are dismissed before trial, ... the state claims should be dismissed as well.").

## V.   CONCLUSION

For the reasons discussed, the Court **GRANTS IN PART AND DENIES IN PART** defendant's motion for summary judgment (ECF No. 21). The Court **GRANTS** the defendant's motion as to plaintiff's race-based discrimination and retaliation claims and aged-based discrimination claims, and those claims are **DISMISSED WITH PREJUDICE**. The Court **DENIES** defendant's motion as to plaintiff's age-based ELCRA retaliation claim, but this claim is **DISMISSED WITHOUT PREJUDICE** as the Court declined to exercise supplemental jurisdiction over the remaining state court claim. This matter is now closed.

33

s/Shalina D. Kumar
Shalina D. Kumar
United States District Judge

Dated: January 14, 2026